[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-13273
_____

D.C. Docket No. 1:10-cv-22692-PCH

MANUEL ANTONIO RODRIGUEZ,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 30, 2014)

Before CARNES, Chief Judge, TJOFLAT and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Petitioner, Manuel Antonio Rodriguez, is a Florida prison inmate sentenced

to death for three murders committed during the course of a burglary on the

evening of December 4, 1984, in Miami, Florida.  He seeks the vacation of his

convictions for murder and armed burglary and of his death sentences on the grounds that the State (1) elicited or failed to correct false testimony during the guilt phase regarding the benefits it afforded a key prosecution witness in exchange for his testimony and (2) withheld evidence favorable to his defense during both the guilt and sentencing phases, in violation of the procedural due process rules established by the United States Supreme Court in Giglio v. United States[1] and Brady v. Maryland.[2]  The Florida Supreme Court found that neither violation had occurred, and therefore refused to disturb Petitioner's convictions or death sentences.  Rodriguez v. State ("Rodriguez II"), 39 So. 3d 275 (Fla. 2010). Petitioner then turned to the United States District Court for the Southern District of Florida for relief, petitioning that court for a writ of habeas corpus.[3]  The District Court, concluding that the Florida Supreme Court properly applied the

---

[1] 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).
[2] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
[3] See generally 28 U.S.C. § 2254.

Giglio and Brady rules in denying Petitioner's claims,[4] denied the writ. We affirm.[5]

I.

A.

On December 4, 1984, Virginia Nimer, her husband Wally Nimer, and her sister Genevieve Abraham planned on having dinner together at a Miami restaurant after Abraham visited two elderly friends, Sam and Bea Joseph,[6] at their apartment.[7] When she failed to appear at the restaurant and their phone calls to the Josephs' telephone number were not answered, the Nimers went to the Josephs'

---

[4] The District Court reached its conclusion under the standards set out in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. §§ 2241–55). See infra part III.A.

[5] Our review of the denial of a writ of habeas corpus is limited to the issues presented in a certificate of appealability ("COA") issued pursuant to 28 U.S.C. § 2253(c)(1). The District Court granted Petitioner's application for a COA as to these issues: (1) Whether "Brady/Giglio/Strickland violations . . . occurred during [Petitioner's] trial [and] rendered his convictions unreliable," and (2) whether "Brady violations that occurred during the penalty phase rendered his death sentence unreliable." Strickland refers to Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and Petitioner's claim that his attorneys failed to provide him with the effective assistance of counsel required by the Sixth Amendment's Assistance of Counsel Clause, which is applicable to the States through the Fourteenth Amendment's Due Process Clause. See Gideon v. Wainwright, 372 U.S. 335, 344, 83 S. Ct. 792, 796, 9 L. Ed. 2d 799 (1963). Petitioner's opening brief in this appeal abandoned the argument that his attorneys failed to provide the effective assistance of counsel Strickland requires. Petitioner's Corrected Br. at 26 n.4. We therefore limit the appeal to Petitioner's Brady and Giglio claims.

[6] The Josephs were in their early 80s; Abraham was 73.

[7] The apartment, number 9, was located in an apartment complex at 6080 S.W. 40th Street, in Miami.

3

apartment.  The front door was open about an inch.  They entered the apartment and found Abraham and the Josephs dead.[8]  Abraham was seated in a chair near the front door and had a string of pearls around her left hand.  Bea Joseph was face down on the floor between the kitchen wall and the dining room table.  Clutched in her hands were a silver necklace and a bloody napkin.  Sam Joseph was on the floor on the other side of the dining room table, with his legs under the table.

According to the Medical Examiner, Abraham had a bullet lodged in her left shoulder.  The bullet went through her right ear and into her head, fracturing the scalp bone and, continuing downward, two cervical vertebrae.  The bullet severed her spinal cord almost completely and came to rest against her left shoulder blade.  A second bullet lodged in the bone above her eye socket, but did not penetrate the brain.  The entry wound was surrounded by soot and stippling, indicating that the bullet had been fired at close-range.  The wound was consistent with a gun being fired next to the victim's temple by someone standing while the victim was seated.  The way the body was found indicated that the shot entered above the eye socket was the second shot.  Death was caused by the first bullet.

---

[8] Nothing about the scene indicated a forced entry into the apartment.  Someone had entered the apartment and rummaged through the master bedroom, emptying drawers of a night stand beside the bed and the bedroom dresser, and had gone through the clothes in the walk-in closet.  An empty jewelry box was at the foot of the bed, and Bea Joseph's jewelry—including her diamond earrings and diamond watch—was missing.

Bea Joseph's lips were swollen and bloody, and her upper lip had a one-eighth-inch split. The injury appeared to have been caused by a blow from an elbow. A bullet had entered one-quarter of an inch to the right of the midline of her forehead. It penetrated the cranial cavity and into the left cerebral hemisphere from front to back, exiting through the back of the occipital lobe, and lodging in the bone in that area, fracturing it. Bea would have died very quickly as a result of this wound; within a couple of minutes, at most. A second bullet grazed the back of her neck. That it did not strike any part of her back indicated that her head and neck were bent forward at the time the wound was inflicted, probably after the shot to the forehead.

Sam Joseph had an entry wound on the back of one hand, in the web between the thumb and index finger, and an exit wound on the palm of his other hand, indicating that the wounds were caused by one bullet. Another bullet pierced his left shoulder. Two more bullets entered his cheek, very close together in quick succession. One went into the cranial cavity, into the right cerebral hemisphere, after going through the maxilla. The bullet's disruption of the frontal lobe would have caused his death within a few minutes. The other bullet entered the soft facial tissue and exited at the base of the neck, grazing the folds of the skin. This indicated that Sam's head was thrown back at the time this shot was fired.

5

Petitioner, his girlfriend Maria "Cookie" Malakoff, and their children lived in the same apartment complex as the Josephs. The Joseph family owned the apartment complex. Sam Joseph managed it and collected the rent.[9]

On July 4, 1985, a tipster identifying himself as Antonio Heres Chait contacted the Metro-Dade Police Department,[10] claiming to have information about the murders. He was referred to Detective William Venturi, the lead investigator in the case. After identifying himself and providing Venturi with his date of birth, social security number, current address, and telephone number, Chait informed Venturi that, in December 1984, he was living in the apartment complex where the murders took place; his apartment was number 3. He stated that, on the evening of December 4, he saw two males running from the apartment complex from the direction of apartment 9, and that he knew one of the men, whom he identified as "Juanito." Detective Venturi asked Detective Daniel Baretta to look into the matter. Detective Baretta found nothing, except that Chait's real name was

---

[9] Tama Zaydon, the Josephs' granddaughter, testified that her parents owned the building. The day before the murder, she visited the Josephs' apartment which was kept impeccably neat. She saw it after the murders and said there was a "big mess everywhere." Doc. 16-50, at 28.

[10] In 1997, the Metro-Dade Police Department became the Miami-Dade Police Department.

6

Manuel Antonio Rodriguez—the Petitioner in this case—and that he had a Metro-Dade Police Department number identifying a criminal record.

On November 25, 1985, Petitioner called the police again, identifying himself as Antonio Traves. Detective Venturi met him and informed him that they knew his real identity and that he had given them bogus information in July. Petitioner admitted that he had lied, and then gave Venturi some new information that raised Venturi's suspicions. Referring to the murders, Petitioner said that they occurred between 6:30 and 7:00 p.m., information Venturi had not provided him on July 4, 1985, and that he saw another individual leaving the area of apartment 9, whom he identified as "Geraldo." Petitioner said that Geraldo "looked exactly like the composite" etching of the suspect the police had published, that he had seen Geraldo driving a white Camaro, and that he had been reluctant to reveal his name because he feared Geraldo due to Geraldo's "violent past." Doc. 16-53, at 87–88.

The information proved worthless. On November 29, Detective Venturi summoned Petitioner to the police station, accused him of being involved with the murders, and read him his Miranda rights.[11] Petitioner waived his rights, including the right to the presence of counsel, and began responding to Detective Venturi's

---

[11] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

7

questions.  He acknowledged knowing the Josephs; he had done some work for them.  He referred to "Mr. Joseph" as "a very stingy person."  Doc. 16-53, at 93. When Venturi asked him to describe his participation in the murders, Petitioner "bowed his head down and he just began to cry," said he was "getting sick," and refused to answer further questions.  Doc. 16-53, at 94.  With that, the questioning ceased.

By 1992, the murder investigation had become a "cold case," dormant.  The Metro-Dade police had received and investigated hundreds of leads, but all turned out to be false.  In March of that year, Ralph Lopez called the Metro-Dade Police Department's "Crime Stoppers" section, claiming to know who committed the murders.  He was referred to two homicide detectives in the "cold case squad," Gerard Crawford and Gregory Smith, who had inherited the case.[12]  Lopez informed them that, in late 1984 or early 1985, his sister's husband's brother, Luis Rodriguez, told him that he and Tony Rodriguez had committed the murders.[13]

---

[12] Detective Venturi had retired from the Metro-Dade Police Department in 1987. Detective Crawford was the lead investigator on the case going forward.

[13] Lopez's sister, Velia, was married to Isidoro Rodriguez, Luis Rodriguez' brother. Lopez was acquainted with Tony Rodriguez (Petitioner) through Tony's girlfriend, Cookie Malakoff, Luis's step-sister.

8

They had gone to the Josephs' apartment for money—to steal the cash Mr. Joseph had on hand.

With Lopez's revelations in hand, the two detectives launched an extensive investigation—to set the stage for a meeting with Luis Rodriguez and, hopefully, to obtain his confession. By August 1993, they were ready. On August 3, they contacted Luis at his place of business in Orlando, told him they were investigating the Joseph/Abraham murders, and asked him if he would accompany them to the Orange County Sheriff's office for questioning. He agreed. The detectives asked him about his background, family, and work history, and he was forthcoming. When Detective Crawford asked if he knew "Tony Rodriguez," his "whole demeanor changed," Doc. 16-62, at 83, and, following a cigarette break, he confessed to having participated in the homicides. A court reporter was summoned, and Luis repeated the confession under oath, on the record. A warrant for his arrest issued, and he was taken into custody.

The next day, August 4, Detectives Crawford and Smith drove to the Tomoka Correctional Institution in Daytona Beach, where Petitioner was incarcerated.[14] Petitioner was summoned. The detectives identified themselves

---

[14] Petitioner was serving multiple prison sentences for a variety of crimes. See infra note 21.

and explained why they were there.  Petitioner already knew; he had spoken to Cookie the day before about their investigation.  The meeting was cordial, lasting perhaps an hour, after which the detectives went to Miami, and went to Cookie's residence to interview her.  Cookie was unavailable.  She called Detective Smith on August 9, "insistent that she give [a] statement that day."  Doc. 16-63, at 7.  "She said that she lived with the horror for years and that she needed to give a statement and tell the truth about what she knew."  Doc 16-63, at 8.  Detective Smith asked Detective Nyberg to interview her.

On August 9, a warrant issued for Petitioner's arrest.  On August 13, following his arrest that day, Detectives Smith and Crawford brought Petitioner to the Metro-Dade Police Headquarters in Miami.  There, they advised him of his rights, which he waived, then asked him a series of preliminary questions concerning his level of education, proficiency in English, and mental state.  Petitioner said he finished the ninth grade, had no problem in communicating in English, and had taken medication that morning, Trilafon and Benadryl.  He said that the medication did not impair his ability to understand what was taking place, but it did make him a bit nervous and restless.

After responding to these preliminary questions, Petitioner was asked about his relationship with Luis Rodriguez and Isidoro Rodriguez.  He said they were "not trust worthy and that they were rumored to be criminals or engaged in

10

criminal activity." Doc. 16-63, at 30. The questioning then turned to Petitioner's activities on the day of the murders. Petitioner, in answering their questions, was, in Detective Smith's words, "very cooperative." Doc. 16-63, at 33. At the same time, his answers were markedly inconsistent. With some answers he was not at or near the crime scene at all and in others he took Luis and Isidoro to the Josephs' apartment, number 9, and stood outside in the hallway after they entered it.

Petitioner began by saying that he was in Homestead, Florida, the afternoon of December 4, 1984. Cookie, his daughter Natasha, and his stepson Landi stayed behind in their apartment, number 3. They soon left the apartment, though, because Cookie had placed "bug bombs" in all the rooms. On reflection, Petitioner thought she probably placed the bug bombs following his return from Homestead. After that, he, Cookie, and the children left the apartment and drove to his mother's residence, where they stayed all night. On further reflection, Petitioner said that after leaving the apartment, they drove to Miami Children's Hospital so Natasha could receive treatment for her heart condition.

After relating this, Petitioner digressed and talked about a "conspiracy" involving the Josephs and the apartment complex. The conspiracy also involved some doctors for whom Cookie had worked who had purchased the complex following the murders. At this point in the interview, Detective Smith informed Petitioner that Luis Rodriguez had given a "detailed full confession" of the

11

murders. Doc. 16-63, at 35. Upon hearing this, Petitioner said that Cookie's family didn't like him, that they would lie about him, and that he had been lying—giving a false alibi—so he could "cover for Cookie's family." Doc. 16-63, at 36. Cookie's family, he said, was involved in the crime. Earlier in the conversation, Petitioner said that Luis Rodriguez was not present during the events that took place on December 4. After claiming that he had given a false alibi to cover for Cookie's family, however, Petitioner said that Luis did come to their apartment that day for a visit.

Detective Smith responded to this by informing Petitioner that in addition to Luis's confession, Cookie and Isidoro had also implicated him in the homicides. Petitioner's reply to that was, "I did not shoot anybody." Doc. 16-63, at 38. He repeated the statement every time the detectives asked him what actually happened. At one point, he said, "I didn't go inside." Doc. 16-63, at 39. He explained that Luis had come from Orlando that day to visit with him and Cookie. Luis was in need of money and needed his help. Petitioner told Luis that his landlord would probably have money, from the rents he had collected, but that he would not assist Luis in taking the money. Luis's response was that all Petitioner had to do was help him get inside the Josephs' apartment and that he would handle the rest. Petitioner agreed.

12

According to Petitioner, as he and Luis were walking toward the Josephs' apartment, they stopped so Luis could make a phone call.  Moments later, Isidoro appeared on the scene.  On arriving at the apartment, Petitioner knocked on the door.  Mr. Joseph came to the door.  Luis and Isidoro forced their way into the apartment and Petitioner remained outside, taking up a position at the corner of the building.  Within seconds, Petitioner heard gunshots.  Several minutes later, Luis and Isidoro came out.  Isidoro left the scene.  Petitioner and Luis went to Petitioner's apartment, woke up Cookie and the children, and departed in Petitioner's station wagon, with Cookie driving.  They drew alongside a canal, and Luis threw several objects into the water.  From there, they went to Miami Beach, dropped Luis off, and proceeded to Petitioner's mother's residence.

B.

On September 15, 1993, a Dade County, Florida, grand jury indicted Petitioner and Luis Rodriguez for the capital murder of Bea Joseph, Sam Joseph, and Genevieve Abraham and for armed burglary.  At their arraignment before the

13

Dade County Circuit Court, both defendants pled not guilty and demanded a trial by jury.[15]

Over the next several months, the parties engaged in extensive discovery. Among other things, the attorneys for the two defendants took the depositions of the material witnesses. These attorneys also moved the Circuit Court to suppress the statements the defendants made to the detectives investigating the crimes at issue. On April 10, 1995, following an evidentiary hearing, the court announced its rulings. The court denied Luis Rodriguez's motion in full, finding that, on August 3, 1993, he freely and voluntarily confessed under oath before a court reporter, after waiving his Miranda rights.[16] The court denied Petitioner's motion with respect to his post-Miranda statements. On August 15, 1995, the Circuit Court granted the defendants' motions to sever the case for trial.

On April 25, 1996, in open court and in Petitioner's presence, Luis Rodriguez and the State announced that they had entered into a plea agreement. Luis would plead guilty to three counts of second degree murder and one count of

---

[15] The reasons for the delay during the 31 months between Petitioner's arraignment in September 1993 and the start of trial in October 1996 are irrelevant to the issues involved in this appeal.

[16] The court found that the initial statements Luis made to Detectives Crawford and Smith before he was advised of his rights were noncustodial and thus admissible at trial.

14

armed burglary and would be sentenced on each count to life imprisonment, with a three-year mandatory minimum term, in exchange for his truthful testimony against Petitioner.[17]  The court accepted the plea agreement, Luis entered pleas of guilty according to its terms, and the court sentenced him to concurrent sentences of life imprisonment.

Luis pled guilty because the State had an open and shut case against him. He had confessed to premeditated murder under oath before a court reporter, and the cold-blooded circumstances under which it was committed were sufficiently aggravating to warrant capital punishment.  To escape the death penalty, Luis had to accept the deal the State offered him.

The trial of the State's case against Petitioner was scheduled to begin on October 7, 1996.  Luis would be the State's star witness.  It was obvious to Petitioner's lawyers, Richard Houlihan and Eugene Zenobi, that they had to destroy Luis's credibility if Petitioner were to avoid the death penalty.  They had to convince the jury that Luis was lying to save his life.  Their questioning of Luis on cross-examination would provide them with the means they needed to do that.

---

[17] The plea agreement also required Luis to submit to a polygraph examination.  Prior to Petitioner's trial, the State moved the court to prevent Petitioner's lawyers from informing the jury in any way of the fact that Luis had submitted to a polygraph examination.  The court granted the motion.

15

The plea agreement would serve as the foundation for the lawyers' cross-examination.  They would show the jury that Luis would do anything to avoid the death penalty—that he was prepared to say whatever the State wanted him to say to obtain Petitioner's convictions for premeditated murder.  To tie Luis down to the story he would tell the jury at trial, the lawyers took his deposition on May 9 and 10, 1996, two weeks after he pled guilty to and was sentenced for second degree murder and armed burglary.  They had already taken the depositions of Detectives Crawford and Smith and other witnesses who might shed light on the circumstances surrounding his decision to plead guilty and testify against Petitioner, so by the time they deposed Luis, they had a good idea of what his testimony was going to be.

In questioning Luis on deposition, the lawyers had the benefit of his plea agreement with the State and a copy of the confession he had given Detectives Crawford and Smith under oath on August 3, 1993.  They also knew of the kid-gloves treatment Luis had been afforded while being held in the Metro-Dade County Jail between August 3, 1993, and May 9, 1996.  Crawford and Smith had accommodated Luis's requests to visit his wife and family by arranging for him to

16

see them at the Metro-Dade Police Station or the State Attorney's office.[18]  At the

police station, Luis met with his family in one of the interrogation rooms.  On one

occasion, when he was alone with his wife, they engaged in sexual intercourse.

Most of these family visits, including the one when Luis and his wife had

sex, occurred before Luis pled guilty and agreed to testify against Petitioner.  Some

visits took place afterwards.  The Assistant State Attorney who was handling the

case, Abraham Laeser, was aware of the visits.  So were Luis's attorneys.

## C.

Petitioner's trial began on schedule, on October 7, 1996.  The State's

evidence portrayed the scene of the crime as the Nimers found it when they went to

the Josephs' apartment the evening of December 4, 1984; Petitioner's visits to the

Metro-Dade Police Department in July and November 1985; the investigation the

police carried out after Ralph Lopez contacted "Crime Stoppers"; Luis Rodriguez's

arrest; and Petitioner's interrogation by Detectives Crawford and Smith.  Luis

described the events that led up to the murders and how they occurred.  The

Florida Supreme Court, in affirming Petitioner's convictions and death sentences,

recounted what Luis told the jury:

---

[18] Some of the visits were to celebrate certain special occasions, such as Luis's daughter's birthday and Christmas.  During the various family visits, Luis met with his wife, daughter, mother, sisters, and mother-in-law, although not all were present on each occasion.

Luis Rodriguez'[s] . . . testimony was somewhat different from his original confession.[19] At trial, Luis testified that in 1984 he was living in Orlando. He stated that Manuel called him and asked if he was interested in making money by assisting Manuel in committing a robbery. Manuel told Luis that Luis would be the lookout and that Manuel would do all of the work. Luis flew to Miami and met Manuel. They went to the Josephs' apartment; Manuel knocked on the door and told Sam Joseph that Malakoff and the children were being held hostage and that they would be released only if the Josephs gave him money. Manuel then forced himself into the apartment. Luis followed and shut the door.

Once inside the apartment, Manuel, who had brought two pairs of rubber gloves with him, put on one pair and told Luis to wear the other pair and not to touch anything in the apartment without the gloves. Sam Joseph offered to get money from the bedroom, but Manuel instructed Luis to look there instead. Luis found a gun in the Josephs' bedroom, and Manuel became angry with Sam Joseph because he thought the offer to get money from the bedroom was actually a ruse to get the gun. Eventually, during the course of the crime, Manuel shot both Sam and Bea Joseph with a gun he had brought with him and then he ordered Luis to shoot Abraham with the gun Luis had found in the Josephs' bedroom. Because Luis was scared, he did as he was told and then he fled. He stated that he did not receive any of the proceeds from the crime and flew back to Orlando the next day.

Rodriguez v. State ("Rodriguez I") 753 So. 2d 29, 34 (Fla. 2000).[20]

---

[19] In his initial confession, Luis Rodriguez stated that he had ingested cocaine and marijuana before the homicides, that he shot Abraham through a pillow, that he shot at two people, and that Manuel Rodriguez shot the Josephs after he shot Abraham.

[20] The Florida Supreme Court's opinion omits the fact that Genevieve Abraham arrived at the Josephs' apartment after Petitioner and Luis had entered. They forced her into the apartment and made her sit in a chair by the front door.

18

The State had Detective Crawford testify before it called Luis Rodriguez to the witness stand. On direct examination, Laeser asked Crawford to explain why Luis was allowed to visit with his wife and family at the Metro-Dade Police Station. Crawford said that allowing an accused to visit with family members was not uncommon, and other detainees awaiting trial were granted the same treatment as Luis. Petitioner's lawyers thought that Crawford's motive for providing the social visits in this case would be critical to the jury's assessment of Luis's credibility and therefore cross-examined Crawford about his reason for allowing the visits:

> Q [Mr. Zenobi]: Was this done for any ulterior motive, was this done so that he would be a cooperative witness or help with prosecution or anything like that?
>
> A [Det. Crawford]: No, sir.
>
> Q: Why was this done?

---

Isidoro Rodriguez also testified as a prosecution witness, corroborating Luis's testimony that he, Isidoro, was not involved in the homicides:

> Isidoro . . . provided documentation that he was working in another city at the time of the crimes. He also stated that, soon after the murders, his mother contacted him to tell him that she had found coins and jewelry in a bag under her trailer and that Manuel and Malakoff had shown up looking for it. Isidoro stated that he was aware of the murders in the building and that he took the bag back to Orlando, where he threw it into a field. Isidoro's mother also testified and confirmed Isidoro's story.

Rodriguez I, 753 So. 2d at 34–35.

19

A: [Luis] requested these visits for [clothes] or contact with his daughter. And there again, we spoke with the supervisor, and there was no reason not to.

Doc. 16-55, at 14.

Q [Mr. Zenobi]: And it never crossed your mind that you were doing those things for any ulterior motive or any special favors you were granting to Mr. Rodriguez?

A [Det. Crawford]: I don't understand your question.

Q: You weren't doing this to have Luis Rodriguez testify in the case, you were doing it because you wanted to be good to Mr. Rodriguez?

A: I wanted to be good to his daughter more than anything. I have no feelings for Mr. Rodriguez.

Doc. 16-55, at 53.

Laeser then asked Crawford about Luis's conjugal visit with his wife:

Q [Mr. Laeser]: Was Luis Rodriguez allowed to have, to the best of your knowledge, a personal visit with his wife or some other woman at any time?

A [Det. Crawford]: Not on my pension.

Q: When you answer that way?

A: No, I am sorry. No, he wasn't.

. . . .

Q: To the best of your knowledge, did it ever happen?

A: No, sir.

Doc. 16-65, at 74.

20

When Luis Rodriguez subsequently took the stand, he was asked, by both the prosecution and the defense, about the plea agreement and his family visits, including the conjugal visit.  Laeser began his direct examination by addressing the plea agreement head-on:

Q [Mr. Laeser]: Some time in the spring of 1996 did you enter into a contract or agreement with the state of Florida to testify truthfully?

A [Mr. Rodriguez]: Yes, I did.

Q: You originally were charged with three counts of first degree murder and one count of burglary.  Were those the charges you eventually pled guilty to?

A: Yes

Q: Eventually were you sentenced for first degree murder, or second degree murder?

A: Second.

Q: For the second degree murder of Sam Joseph what sentence did you receive?

A: Life.

Q: For the second degree murder of Bea Sabe Joseph what sentence?

A: The same.

Q: For the second degree murder of Genevieve Abraham what sentence?

A: The same.

Q: For the crime of burglary while armed what sentence?

A: Those are three years mandatory.

21

Q: Did you receive a life sentence as to that count as well, along with the mandatory three years?

A: Yes.

. . . .

Q: Did you review the plea, study it, discuss it with [your attorneys] before you signed it and agreed to it?

A: I did discuss it with them, yes.

. . . .

Q: Did you sign the document after going over each page of it in court?

A: Yes.

. . . .

Q: In terms of your agreement with the state of Florida is there any agreement whatsoever for you to get out on parole?

A: There is none.

Q: Has anybody promised you – to you or suggested to you that they are going to do you a favor after the trial is over and get you parole one day?

A: They couldn't.

Doc. 16-60, at 57–60.

Houlihan, on cross-examination, elaborated on the good deal Luis had made

for himself in entering into the plea agreement:

Q [Mr. Houlihan]: You were facing the death penalty?

A [Mr. Rodriguez]: True.

22

Q: And the alternative punishment, if you were convicted of first degree murder, was a life prison sentence, but with a minimum mandatory twenty-five years in prison without eligibility for parole. Correct?

A: Is that what it is?

Q: Your lawyer didn't tell you?

A: All that I was told was that there was a twenty-five minimum mandatory on each count and that possibly I could get one of those charges overturned, to a death row conviction.

Q: Okay.  And the sentence could be consecutive.  Right?

A: Consecutive.  Yes.

Q: Which means you could get the death penalty three times for example, right?

A: True.

Q: Or you could get a minimum mandatory seventy-five years in prison.  Right?

A: True.

Q: To you that means you will never get out.

A: Of course.

. . . .

Q: Okay. Now, the plea you have taken was second degree, correct?

A: True.

Q: Life in prison with one minimum mandatory three year sentence?

A: True.

Q: And that is for a use of a gun?

23

A: Right.

Q: Right?  Now, that does not have any minimum mandatory twenty-five years does it?

A: True.

Q: In fact, you can get out, from what you have been told and what you believe, maybe in ten years?

A: I don't know where you have been but I have already called Tallahassee myself, okay, admissions and release.  Life sentence is a life sentence, period.  There is no such thing as parole.  Since 1984.  Six months before this case occurred.

. . . .

Q: Okay.  You remember we had a deposition on two separate days with you.  You remember that?

A: Yes.

Q: Mr. Eugene Zenobi was there?

A: Yes.

Q: I was there?

A: Yes.

. . . .

Q: And on May 10, 1996[,] you were asked the following questions and answers.

. . . .

Q: Okay.  Question: Were you told anything about an estimate about the amount of jail time you would be doing by either your lawyers or by the state attorney or by the police?

24

Answer: After ten years that I would be able to petition and ask for clemency of some kind to the parole board, but it is at their discretion.

Question: Were you told by your lawyers that your chances would be good because you cooperated?

Answer: Yes. There is no guarantee of that.

A: True.

Q: Okay. So as we – as you testified supposedly truthfully today to the jury, right?

A: True.

Q: Do you think there is a chance you could get out in ten years?

A: Anybody filing for clemency might have a chance. You are pleading to the governor of the state. That is anybody. That is anybody. It doesn't mean that you are going to get anything out of it.

. . . .

Q: Do you plan to petition the clemency board or parole after ten years?

A: I would. Yes.

Q: You will. Do you expect to get it because of your cooperation?

A: That is totally up to them.

Q: Do you expect to get it?

A: Ten years down the road I don't even know who is going to be running the state of Florida. How am I supposed to know? I don't know. I can only petition for it. That is all I can do. I can hope for that. I got a daughter. I have hope. I have got a mother out there. That is, you know, these things matter to me.

Doc. 16-60, at 72–78.

25

Q: Is it not a fact that if you do not testify quote, truthfully, unquote –

A: True.

Q: – you get a different plea?  You get a different sentence?

A: I will go back to step one where I will be charged or tried for the original charges.

Q: First degree murder?

A: Right.

Q: And who determines truthfulness?

A: This Court right here.

Q: This Court.  What about those people over there?

A: I don't know what his discretion would be.  I don't know what your discretion would be.  I know that I was told exactly what that plea agreement was all about and I knew that when I came inside this courtroom I couldn't hold back anything.

Doc. 16-61, at 38.

Luis, on direct examination by Laeser and then on cross-examination by Houlihan, was questioned extensively about his family visitations, including the conjugal visit with his wife.

Q [Mr. Laeser]: Have you seen [your family] at all since the time of your arrest?

A [Mr. Rodriguez]: A couple of times.

Q: At what places or what location was that?

A: Over at the jail house I saw [my daughter] once.  And from then I made contacts with detectives, I wanted to see them in a more

26

civilized environment and I went ahead and made contact with them at the station.

Q: In total about how many times do you think that your wife and daughter saw you in the vicinity of the police station?

A: About three times.

Q: Does this happen in the last year or so, or closer to the time of your arrest?

A: Closer to the time of my arrest.

Doc. 16-59, at 62.

Q: Aside from your wife and daughter had any other family members seen you over the months?

A: Yes.

. . . .

Q: During one of these visits were you ever in a room alone with your wife only?

A: Yes, I was.

. . .

Q: In terms of your meeting with your wife, about this particular meeting about how long did it last?

A: About five, ten minutes.

Q: What was the reason that you might have told or asked to be alone with your wife?

A: I needed to speak to her privately. My wife and daughter. My wife and my mother-in-law was also in the room and I wanted to also have a change of clothes that they had brought me, some new clothes.

27

Q: Did you do anything else while you were with your wife in that room other than what you told the police you were going to do?

A: Yes, I did.

Q: Did you have relations with your wife during those few minutes?

A: Yes.

Q: Did you in any way tell the police or let them know that this was going to take place?

A: No.

Q: Did they approve it or say "Go ahead and do whatever you want." Anything like that?

A: They never find out.  I wouldn't have been able to do it if they found out.

Doc. 16-59, at 69–71.

Houlihan pressed Luis on how he was able to engage in sexual intercourse in

an interrogation room while the detectives stood by right outside:

Q [Mr. Houlihan]: You testified already about, you know, you had relations with [your wife] in the Metro-Dade Police Department homicide interrogation rooms, right?

A [Mr. Rodriguez]: Correct.

Q: Now, there is peep holes in those rooms.  You remember that?

A: True.

Q: Now, one of the officers told you or her to put a napkin – or napkin or pieces of paper over the peep hole?

A: If I was speaking to my lawyer, that would seem something that I would want to tell him and that is exactly what I told my lawyer, that he maybe do this.  But it didn't happen like this.  I took advantage of

28

the opportunity.  I put a piece of paper on there.  Nobody told me to do that.

Q: You did that?

A: True.

Q: What kind of paper?

A: Just got a piece of paper and I put it on the peep hole.

Doc. 16-60, at 82–83.

Detective Smith was also asked about the conjugal visit after Laeser called him to the stand.  He denied that Luis had been granted permission for a conjugal visit with his wife and that he was aware of the sexual intercourse while it was taking place.  He said that he learned about the event sometime later.

Q [Mr. Zenobi]: Was [Luis] allowed any conjugal visits with his wife?

A [Det. Smith]: Absolutely not.

Doc. 16-63, at 85.  On redirect examination, Laeser asked Smith about his motivation for permitting Luis to spend time with his family:

Q [Mr. Laeser]: During the course of any of these family visits or anything else[,] did you have some sort of secret agreement with Luis Rodriguez as to what would happen in his case?

A [Det. Smith]: No, sir.

Doc. 16-64, at 8.

The parties' closing arguments at the conclusion of the guilt phase of the trial focused in large part on the credibility of Luis Rodriguez's testimony.

29

Houlihan went first, Laeser then argued for the State, and Houlihan closed with a

rebuttal.  In his opening argument, Houlihan pointed out that "Luis told you . . . he

used the phrase 'He was choking in fear of the death penalty.' . . .  'Choking in fear

of the electric chair' I believe is how he put it.  Choking in fear.  He is scared."

Doc. 16-64, at 86.  Houlihan then asked,

> Well, what is so special about Luis Rodriguez that he is taken
> out over and over and over again by the Metro-Dade homicide people.
> And taken to homicide, taken here, taken there.  Why?  What is so
> special about him?  That is not the normal way it is done.  Totally
> different.  Why?
>
> I told you in the beginning concerning a deal with the devil, if
> you remember that phrase.  Luis Rodriguez is dishonest.
>
> . . . .
>
> He has come here and taken an oath to tell the truth and he has
> lied.  He has lied, he says, because he is fearful of the electric chair.
> But he lies.  He has not even up to this point told you the truth.

Doc. 16-64, at 89–90.

> Now, this is the person that the state attorney, that the police
> entered into a deal with.  A deal.  They shook hands on it.
>
> "You come in and you tell us the truth and you get this second
> degree murder –" if you remember – "and live."
>
> Up to this point Luis is facing – his worse [sic] fear was the
> electric chair, but the other fear was, if you recall from the evidence,
> life in prison; first degree murder with a minimum mandatory twenty-
> five years without parole.
>
> . . . .

30

So he enters into a deal.  He shakes on it.  "Come in here and tell the truth" and he gets second degree and life.  And he talked to you about why he called up the parole commission.  You remember?  "Oh yes.  I called up these clemency people."

Well, why is he doing that?  He intends in ten years or so to get out.

Is there some sort of agreement unseen by any of us?  I don't know, but that is his intention.  Is – is he right, or is he wrong?  One – three murders and one sentence for second degree murder.  Why such a deal?

Why does he have relations with his wife in the Metro-Dade Homicide Office?  If you remember, some of the cops said "Well, I don't know anything about that."  One of them, Crawford, said "You know, I could lose my pension if that happened."

You know, and he should lose his pension if he was a participant in that type of activity, because it is wrong.

"It doesn't happen."  It happened to him.  Why?  Somebody else sitting over in the Dade County jail, they don't get taken out and taken over to homicide.  Why this guy?  What is going to happen?

Doc. 16-64, at 91–92.

Laeser, countering Houlihan's argument, pointed out that Luis was not

threatened or improperly motivated to testify a certain way:

Did Luis Rodriguez say "I was threatened.  I was forced.  I was coerced.  Police mistreated me in order to get me to give this statement."

Did the detective say "We had to raise our voices to him.  We had to slap our hand on the table.  We had to tell him we are going to do something to his mom and family" before he would admit what he did.

31

The witness didn't say that.  The witnesses said "As soon as we told him that we had spoken to Tony he broke down.  And started to talk and hasn't stopped since."

Doc. 16-65, at 69.

And what is the cross examination of Crawford and Smith and all of the detectives?  "You gave Luis Rodriguez special treatment didn't you."

Yes.  He was allowed to see his daughter on her birthday once three years ago.

Yes.  He was allowed to have his family see him for Christmas in the police station once three years ago.  After his confession.  After he had given a statement implicating this defendant.  After he had said that "The only people involved in this crime were myself and Tony."

What – what do the police get out of being decent and letting him see his family?  Do they get a new story, a new version, new facts, new suspects?  Or are they just being decent to somebody who has already admitted his acts and asked for permission to see his family?

Is there a motive to force Luis to continue to tell the truth?  "Okay.  You have told us the truth on August the 3rd.  We want you to continue telling us the truth, so we are going to let you see your daughter on her birthday."

How's that for a deal.

Doc. 16-65, at 72–73.

Luis Rodriguez had the greatest motivation in the world to tell the truth on that witness stand.  He knows what happens if he lies about what happened to you jurors.  He knows that his deal with the state is void.  That means he gets reprosecuted.  We seek the death penalty against him.

He knows that every single conversation he has had with the police, law enforcement and prosecutors from the day of his plea in

32

April until and including his testimony can be used against him to convict him.

The only way he can keep himself from being reprosecuted is to tell the truth. That is his only obligation.

What is his motive to lie to you jurors?

. . . .

In all of his cross examination, the special treatment and the fact that he was actually allowed to eat a lunch outside the jail, and everything else, does that change what he ever said in 1985? Does he tell Ralph Lopez "It was me and Tony." In 1993 does he tell the police "It was me and Tony"? In 1996 in front of you jurors does he say "It was me and Tony"?

What does the special treatment have to do with it? What is that all about? Other than a way to keep you from focussing [sic] on the fact that twenty-two witness and a hundred and three exhibits point to only one person on earth. This man. That is what every single bit of evidence that you have heard points.

Doc. 16-65, at 89–91.

During his rebuttal, Houlihan made one last attempt to discredit Luis and his testimony:

Luis to this day hasn't told the truth. What Luis has done, he started getting into the script because it was worth it to him to take the plea. . . . He cooperates with the police. He goes and sees his family.

He will do whatever he perceives he needs to do for Luis.

Doc. 16-66, at 28.

On October 24, after thirteen days of testimony, the jury found Petitioner guilty on three counts of capital murder and one count of armed burglary, as

33

charged in the indictment.  The trial of the penalty phase of the case was deferred

to December 9.  The Florida Supreme Court summarized the evidence presented at

that time, to the same jury.

> The State presented evidence that Manuel Rodriguez had seventy-one prior violent felony convictions (the contemporaneous murders in this case, twenty-three convictions of armed robbery, seventeen for armed kidnaping, eight for aggravated assault with a firearm, and numerous convictions for carrying a concealed weapon and possession of a firearm by a convicted felon) and that he was on probation and parole at the time of the murders.
>
> Both the State and Manuel Rodriguez presented the testimony of numerous psychologists and psychiatrists who had evaluated Rodriguez over the preceding twenty years.  Apparently, whenever Rodriguez was charged with a crime, a question of competency was raised and he was evaluated.  Most of those who examined him agreed that he suffered from some sort of mental illness, but the testimony varied greatly in that some had previously found him to be incompetent and in need of hospitalization; others had found him to be malingering.  None could testify to his state of mind at the time of the murders.  The testimony did establish that Rodriguez had a long history of drug abuse.  Several of his family members testified regarding his childhood and his mother's mental problems.

Id. at 35.[21]

---

[21] The State established Petitioner's 71 felony convictions through the live testimony of detectives in the Metro-Dade Police Department.  They introduced certified copies of the convictions and described the crimes involved.  Here is what that evidence disclosed:

> May 15, 1977: Armed Robbery of the DuPont Plaza Hotel.  Information Count I: Robbery.  Information Count II: Unlawful Possession of a Firearm while Engaged in Criminal Offense.  Pled guilty on May 21, 1980 to robbery.  Sentenced to ten years' imprisonment and seven years' probation.

June 3, 1977: Armed Robbery of Zagami Supermarket.  Information Count I: Robbery.  Information Count II: Unlawful Possession of a Firearm while Engaged in Criminal Offense.  Pled guilty on May 21, 1980 to robbery.  Sentenced to five years' imprisonment.

July 8, 1982:  Armed Robbery of the U-Totem convenience store.  Information Count I: Carrying a Concealed Firearm.  Information Count II: Grand Theft Second Degree (of the automobile that Rodriguez had driven to the U-Totem).  Pled guilty to both counts.  Sentenced to five years' imprisonment on each count to run concurrently on May 6, 1986.

November 22, 1985:  Carjacking outside a Ramada Inn.  Information Count I: Robbery (of cash and jewelry from the car passenger).  Information Count II: Robbery (of the car, cash, and jewelry from the car owner).  Information Count III: Unlawful Possession of a Firearm while Engaged in a Criminal Offense.  Pled guilty to all counts.  Sentenced to ten years' imprisonment for Counts I and II.  Sentenced to five years' imprisonment for Count III, all sentences to run concurrently.

January 11, 1988: Armed Robbery of a Fabric King fabric store.  Information Count I: Robbery (of jewelry from a store clerk).  Information Count II: Robbery (of cash from the store clerk).  Information Count III: Robbery (of cash from a different clerk).  Information Count IV: Kidnapping (of the first clerk).  Information Count V: Kidnapping (of the second clerk).  Information Count VI: Unlawful Possession of a Firearm by a Convicted Felon.  Information Count VII: Carrying a Concealed Firearm.  Adjudged guilty and convicted of all counts on May 4, 1992.  Sentenced to thirty years' imprisonment for Counts I through V.  Sentenced to fifteen years' imprisonment for Count VI.  Sentenced to five years' imprisonment for Count VII.  He was also sentenced to three years' mandatory minimum for use of a firearm.  All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

January 19, 1988: Armed Robbery of a Burger King.  Information Count I: Kidnapping (of a counter clerk).  Information Count II: Robbery (of cash from the counter clerk).  Information Count III: Robbery (of gift certificates from the Burger King).  Information Count IV: Robbery (of jewelry from the counter clerk).  Information Count V: Aggravated Assault (of the clerk).  Information Count VI: Aggravated Assault (of a different clerk).  Information Count VII: Aggravated Assault (of yet another clerk).  Information Count VIII: Carrying a Concealed Firearm.  Information Count IX: Unlawful Possession of a Firearm by a Convicted Felon.  Adjudged guilty and convicted of all counts on May 4, 1992.  Sentenced to thirty years' imprisonment for Counts I through IV.  Sentenced to five years' imprisonment for Counts V through VIII.  Sentenced to fifteen years'

35

imprisonment for Count IX.  He was also sentenced to three years' mandatory minimum for use of a firearm.  All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

February 20, 1988: Armed Robbery of a Burger King (different than the one in the previous case).  Information Count I: Armed Robbery.  Information Count II: Aggravated Assault.  Information Count III: Unlawful Possession of a Firearm by a Convicted Felon.  Information Count IV: Carrying a Concealed Firearm.  Information Count V: Kidnapping (with a weapon).  Pled nolo contendere to all counts.  Adjudged convicted of all counts on May 4, 1992.  Sentenced to thirty years' imprisonment for Counts I and V.  Sentenced to five years' imprisonment for Counts II and IV.  Sentenced to fifteen years' imprisonment for Count III.  He was also sentenced to three years' mandatory minimum for use of a firearm.  All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

March 17, 1988: Armed Robbery of a McDonald's fast food restaurant.  Information Count I: Kidnapping (of a counter clerk).  Information Count II: Robbery (of the clerk).  Information Count III: Robbery (of another clerk).  Information Count IV: Carrying a Concealed Firearm.  Information Count V: Unlawful Possession of a Firearm by a Convicted Felon.  Adjudged guilty and convicted of all counts on May 4, 1992.  Sentenced to thirty years' imprisonment for Counts I and II.  Sentenced to five years' imprisonment for Counts III and IV.  Sentenced to fifteen years' imprisonment for Count V.  He was also sentenced to three years' mandatory minimum for use of a firearm.  All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

April 30, 1988: Armed Robbery of a Burger King (different than the other two Burger Kings robbed).  Information Count I: Robbery (of a counter clerk).  Information Count II: Kidnapping (of the clerk).  Information Count III: Aggravated Assault.  Information Count IV: Carrying a Concealed Firearm.  Information Count V: Unlawful Possession of a Firearm while Engaged in a Criminal Offense.  Adjudged guilty and convicted of all counts on May 4, 1992.  Sentenced to thirty years' imprisonment for Counts I and II.  Sentenced to five years' imprisonment for Counts III and IV.  Sentenced to fifteen years' imprisonment for Count V.  He was also sentenced to three years' mandatory minimum for use of a firearm.  All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

September 14, 1988: Armed Robbery of Luna Beds bedding store.  Information Count I: Kidnapping (of owner/wife).  Information Count II: Kidnapping (of owner/husband).  Information Count III: Robbery.  Information Count IV:

36

Carrying a Concealed Firearm.  Information Count V: Unlawful Possession of a Firearm by a Convicted Felon.  Adjudged guilty and convicted of all counts on May 4, 1992.  Sentenced to thirty years' imprisonment for Counts I and II. Sentenced to five years' imprisonment for Counts III and IV.  Sentenced to fifteen years' imprisonment for Count V.  He was also sentenced to three years' mandatory minimum for use of a firearm.  All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

October 5, 1988: Armed Robbery of Indoor Gardener Florist.  Information Count I: Robbery (of a clerk).  Information Count II: Kidnapping (of the clerk). Information Count III:  Robbery (of another clerk).  Information Count IV: Kidnapping (of the other clerk).  Information Count V: Unlawful Possession of a Firearm by a Convicted Felon.  Information Count VI: Aggravated Assault. Information Count VII: Unlawful Possession of a Firearm while Engaged in a Criminal Offense.  Information Count VIII: Carrying a Concealed Firearm. Adjudged guilty and convicted of all counts on May 4, 1992.  Sentenced to thirty years' imprisonment for Counts I through IV.  Sentenced to fifteen years' imprisonment for Counts V and VII.  Sentenced to five years' imprisonment for Counts VI and VIII.  He was also sentenced to three years' mandatory minimum for use of a firearm.  All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

November 11, 1988: Armed Robbery of Fantasy Travel.  Information Count I: Kidnapping (of a travel agent).  Information Count II: Kidnapping (of a second travel agent).  Information Count III: Kidnapping (of a third travel agent). Information Count IV: Robbery (of the first travel agent).  Information Count V: Robbery (of the second travel agent).  Information Count VI: Robbery (of the third travel agent).  Information Count VII: Carrying a Concealed Firearm. Information Count VIII: Unlawful Possession of a Firearm by a Convicted Felon. Adjudged guilty and convicted of all counts on May 4, 1992.  Sentenced to thirty years' imprisonment for Counts I through VI.  Sentenced to five years' imprisonment for Count VII.  Sentenced to fifteen years' imprisonment for Count VIII.  He was also sentenced to three years' mandatory minimum for use of a firearm.  All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

November 14, 1988: Armed Robbery of a Clothestime clothing store. Information Count I: Kidnapping (of a store clerk).  Information Count II: Kidnapping (of a different clerk).  Information Count III: Robbery (of the store clerk).  Information Count IV: Robbery (of the other clerk).  Information Count V: Carrying a Concealed Firearm.  Information Count VI: Unlawful Possession of a Firearm by a Convicted Felon.  Adjudged guilty and convicted of all counts on

37

One of the witnesses who testified for the State during the penalty phase was Detective Crawford. The State called Crawford for the purpose of rebutting the opinions of Petitioner's psychologists and psychiatrists that Petitioner suffered from mental illness. Over Petitioner's objection, Crawford testified that in September 1993, he spoke to Alejandro Lago, a jailhouse snitch, who, like Petitioner, was being held in the Metro-Dade County Jail. Lago was being detained on a charge of attempted first degree murder.[22] According to Crawford, Lago reported that Petitioner had informed him that he was being treated for mental illness and was on medication but did not need it—he was taking the

May 4, 1992. Sentenced to thirty years' imprisonment for Counts I through IV. Sentenced to five years' imprisonment for Count V. Sentenced to fifteen years' imprisonment for Count VI. He was also sentenced to three years' mandatory minimum for use of a firearm. All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

January 3, 1989: Armed Robbery of a Burger King (the same Burger King in the February 20, 1988, case). Information Count I: Kidnapping (of the counter clerk). Information Count II: Kidnapping (of the Burger King manager). Information Count III: Robbery (of the counter clerk). Information Count IV: Robbery (of the manager). Information Count V: Aggravated Assault. Information Count VI: Carrying a Concealed Firearm. Information Count VII: Unlawful Possession of a Firearm by a Convicted Felon. Adjudged guilty and convicted of all counts on May 4, 1992. Sentenced to thirty years' imprisonment for Counts I through IV. Sentenced to five years' imprisonment for Counts V and VI. Sentenced to fifteen years' imprisonment for Count VII. He was also sentenced to three years' mandatory minimum for use of a firearm. All sentences to run concurrently for these convictions but consecutively for sentences from other cases.

[22] Lago was subsequently convicted of the charge. Doc. 16-72, at 81.

38

medication "basically just to stay high" and "to give [it] to other inmates in trade for favors." Doc. 16-72, at 83. Crawford went on to say that in December 1993, Lago gave him some of Petitioner's medication and said that Petitioner told him that he "was going to act crazy." Doc. 16-72, at 88.[23]

After deliberating over the sentences to recommend the jury recommended by a unanimous vote that the court impose the death penalty for each murder. The court accepted the recommendation and sentenced Petitioner accordingly.[24] The court found six aggravating circumstances: (1) Petitioner had several violent felony convictions,[25] and (2) the murders were committed while Petitioner was under a sentence of imprisonment,[26] (3) during the commission of armed burglary,[27] (4) to eliminate witnesses and avoid arrest,[28] (5) for pecuniary gain,[29] and (6) were cold,

---

[23] Petitioner's counsel took Lago's deposition on April 22, 1996. Crawford's testimony of what Lago told him in September and December 1993 was consistent with Lago's deposition testimony. Petitioner's lawyers chose not to cross-examine Crawford or call Lago as a witness, presumably to rebut Crawford's testimony. On Petitioner's direct appeal, the Florida Supreme Court held that the trial court erred by allowing Crawford to testify about Lago's statements, but that the error was harmless. See Rodriguez I, 753 So. 2d at 44–45.

[24] The court sentenced Petitioner to life imprisonment on the armed burglary count.

[25] See Fla. Stat. § 921.141(5)(b).

[26] See Fla. Stat. § 921.141(5)(a).

[27] See Fla. Stat. § 921.141(5)(d).

[28] See Fla. Stat. § 921.141(5)(e).

[29] See Fla. Stat. § 921.141(5)(f).

calculated and premeditated.[30]  The court found no statutory mitigating circumstances, but found some nonstatutory mitigation; Petitioner "was and is mentally ill, . . . has a history of drug abuse and drug psychosis, and . . . is a good brother, loving father, and caring son." Rodriguez I, 753 So. 2d at 35.  The court rejected as a mitigating circumstance the fact that Luis Rodriguez received concurrent life sentences for the three murders.  Id.

### D.

The Florida Supreme Court affirmed Petitioner's convictions and death sentences.  Rodriguez I, 753 So. 2d at 33.  The United States Supreme Court denied certiorari review. Antonio Rodriguez v. Florida, 531 U.S. 859, 121 S. Ct. 145, 148 L. Ed. 2d 96 (2000).  Thereafter, Petitioner moved the Dade County Circuit Court to vacate his convictions and sentences pursuant to Florida Rule of Criminal Procedure 3.850.[31]  In his motion, as amended, Petitioner presented twenty-two claims for relief.[32]  We consider only the federal constitutional claims

---

[30] See Fla. Stat. § 921.141(5)(i).

[31] Florida Rule of Criminal Procedure 3.850 is titled "Motion to Vacate, Set Aside, or Correct Sentence," and sets out the procedures and requirements for obtaining relief.

[32] The claims were based on both state law and federal constitutional law.  See Rodriguez II, 39 So. 3d at 282 n.5.

40

covered by the COA.[33]  The Circuit Court denied them following an evidentiary

hearing, and the Florida Supreme Court affirmed.  Rodriguez II, 39 So. 3d at 279.

We frame these claims as the Florida Supreme Court did in its affirmance.[34]  They

are: (1) "[T]he State violated Giglio and Brady by suppressing information that in

order to obtain Luis's cooperation in testifying against Rodriguez, Luis was

provided with special accommodations, including unsupervised visits with his

family and being permitted to have sexual relations with his wife while in jail."  Id.

at 289.[35]  (2) "[T]he State violated Brady or Giglio because the State failed to

---

[33] See supra note 5.

[34] We do so because, in appealing the Circuit Court's denial of Rule 3.850 relief, Petitioner's brief described the claims he had presented to the Circuit Court and his arguments to the Florida Supreme Court on appeal in a rambling convoluted fashion that, for the most past, conflated his Giglio, Brady, and Strickland arguments.  This accounts for the way in which the District Court framed the issues for this appeal in its COA.  See supra note 5.  The Florida Supreme Court, in addressing Petitioner's arguments, rearranged, in part, the claims he had presented to the Circuit Court and in doing so expressed the gist of what Petitioner seemed to be contending.

[35] Petitioner's brief express this claim in these words:

> The State permitted and facilitated sexual visits between its key witness, Luis Rodriguez, and his wife while he was in police custody.  Luis, the co-defendant turned snitch, was granted these special visits with his wife as well as visits from his family . . . in exchange for his continued cooperation.  This was undisclosed consideration in violation of Brady . . . .

> Not only was the motive for the special visits hidden but the jury was misled as to the motive in violation of Giglio.  The State improperly bolstered its key witness and failed to correct error in Detective Crawford's testimony, thus misleading the jury as to the credibility of Luis.

Petitioner's Corrected Br. at 29.

41

disclose potential impeachment evidence . . . that Luis was promised help in obtaining parole." Id. at 288. "[T]he prosecutor presented false testimony and failed to disclose that Luis was promised assistance in obtaining parole if he testified against Rodriguez," id. at 289, in that Luis was led to believe that "he would be receiving assistance in obtaining parole based on some conversations he had 'behind closed doors.'" Id. at 290.[36] (3) The State violated Brady "when [it] failed to disclose two letters that jail inmate Willy Sirvas wrote to the prosecutor, prior to trial, alleging that Luis Rodriguez would lie." Id. at 285–86. These are the texts of the two letters dated August 10, 1995, and May 28, 1996, respectively:

Dear Laeser-Hague:

    I'm in the same dormitory as inmate Luis Rodriguez # 93-65604. You have to ask for continuance on August 14. Rodriguez told me everything about the murders and he said that the state can't pruebe [sic] him anything without a witness or pruebes [sic] that lead him to this murders. I will get in touch.

. . . .

Dear Mr. Abe Laeser and Andrew Hague:

    A year ago I wrote a letter to the state attorney office. And my letter ignore. [sic] Now, Mr. Richard Houlihan could use my

_____

[36] Petitioner's brief expressed this claim this way: "The State did not disclose that the prosecutor promised to assist Luis in obtaining parole as part of his plea agreement." Petitioner's Corrected Br. at 28. "Based on conversations that were held 'behind closed doors,' Luis testified that he expected the State to fulfill additional promises that were never disclosed to defense counsel." Petitioner's Corrected Br. at 47.

42

> testimony in court in reference to Luis Rodriguez lies to save his ass, is only one true.  [sic]

Id. at 286 (alteration in original).[37]  (4) The State violated Brady when it "fail[ed] to disclose letters pertaining to potential impeachment of Alejandro Lago, a witness whose hearsay statements were heard by the jury in the penalty phase through Detective Crawford."  Id. at 283.  "[T]he letters show[ed] that Lago received consideration in exchange for his assistance and that the results of a polygraph test that he took were considered suspect."  Id. at 294.[38]

The Florida Supreme Court affirmed the Circuit Court's denial of these four claims as follows.  As to claim (1), the Florida Supreme Court recounted that "Luis . . . was permitted to have visits with various members of his family [and] a meeting with his wife alone for about five or ten minutes and . . . had sexual relations with her."  Id. at 289.  However, Petitioner's lawyers knew all about "these incidents" and "cross-examined Luis about [them] at trial."  Id. Accordingly, the family and conjugal visits, standing alone, did not constitute a claim.  Thus, whether claim (1) presented a valid ground for relief turned on the

---

[37] Assistant State Attorney Andrew Hague assisted Abraham Laeser, the lead prosecutor, in handling the State's case.

[38] As note 23, supra, explains, in appealing his convictions and death sentence to the Florida Supreme Court, Petitioner challenged the admissibility of Detective Crawford's testimony of what Lago had reported to him.  The court found that the trial court erred in admitting Crawford's testimony, but concluded that the error was harmless.

whether the State deliberately withheld from the defense Detectives Crawford and Smith's <u>motive</u> or <u>purpose</u> in providing Luis with these "special accommodations"—in particular, in allowing him to have sex with his wife— which was to obtain his testimony against Petitioner.  See id.  The Florida Supreme Court read this claim as having been brought under both Giglio and Brady.  The Giglio aspect is that, with the prosecutor's knowledge, the detectives lied about their motive and purpose in providing these special accommodations.  The Brady aspect is that the prosecution withheld from the defense the reason for these special accommodations.

The Circuit Court resolved this claim against Petitioner on the basis of the testimony Luis and the two detectives gave at the Rule 3.850 evidentiary hearing. As the Florida Supreme Court explained:

> At the evidentiary hearing, Luis testified that while he was unsure whether the police knew that he had sexual relations with his wife, the officers did suggest that, if he needed privacy with his wife, he should place a sticker over the peephole in the window of the door. The two officers testified at the evidentiary hearing that they were not aware Luis had sex with his wife and denied that they granted him permission to have sexual relations by using stickers to cover the peephole. The prosecutor testified that he did not knowingly present false testimony when the detectives testified at trial that they did not permit Luis to have sexual relations with his wife.

Id.  The Circuit Court denied the claim because it found the statements Luis made at the hearing incredible and the detectives' statements credible.  The Florida

44

Supreme Court, bound by the rule that credibility determinations are matters for

the trial court, found that

> competent, substantial evidence support[ed] the trial court's factual
> findings.  Luis's recent testimony was contrary to his prior sworn
> statements at trial, and at times his testimony at the evidentiary
> hearing conflicted with other statements that he made during the
> hearing.  Because Luis's testimony was the primary support for this
> claim and his testimony was found to be not credible, Rodriguez is
> unable to establish the first prong of either a Brady violation or a
> Giglio violation.  Further, even assuming the change of testimony that
> the police may have known about the sexual relations, the jury was
> already aware that Luis was being provided with special treatment and
> that the police knowingly permitted him to have some private time
> with his wife.

Id.  Because Rodriguez could not "establish either materiality or prejudice," the

Florida Supreme Court denied the claim.  Id.

The Florida Supreme Court made short shrift of claim (2), that the State

violated Brady or Giglio by withholding a promise it made to Luis "behind closed

doors" that it would assist him in obtaining parole and allowing Luis to testify

falsely to the contrary.

> Other than vague, conclusory statements, Rodriguez failed to present
> any evidence to support [t]his claim.  During the evidentiary hearing,
> Luis testified that he thought he would be receiving assistance in
> obtaining parole based on some conversations he had "behind closed
> doors."  No specifics of these conversations were provided.  Luis's
> lawyer also was unable to provide any details as to specific assistance
> that Luis was to be given if he testified against Rodriguez.  Luis
> agreed at the [Rule 3.850] evidentiary hearing that the plea agreement
> expressly states that no promises were being made about his sentence.

45

Because Rodriguez has failed to sufficiently support his allegation as to an undisclosed agreement, he is not entitled to relief.

Id. at 290.

Turning to claim (3), the withholding of the Sirvas letters to prosecutors Laeser and Hague, the Florida Supreme Court, contrary to the Circuit Court, determined that Brady required the prosecutors to disclose the letters to the defense but concluded that the letters were not material. The Florida Supreme Court began its analysis of the claim by describing the circumstances under which Sirvas wrote the letters.

> Sirvas knew Luis because he was in a cell next to Luis when they were both at the Metro West Jail. According to Sirvas, Luis talked about his case and stated that the State offered him a deal to testify against his codefendant because he was facing the death penalty and the State could not prove the charges unless Luis testified. Luis told Sirvas that even though he and his codefendant had a pact not to testify against each other, he would testify against his codefendant and blame it on him.

Id. at 286–87. Then, after concluding that the letters should have been disclosed to defense counsel, the court explained why the letters were not material, why Rodriguez had not demonstrated prejudice.

> Sirvas admitted at the evidentiary hearing that Luis did not tell him any of the specifics about the case itself and that he did not even know the codefendant's name. This testimony was directly contrary to some of the statements in his 1995 letter in which Sirvas alleged that Luis had told him "everything." Because his actual testimony contradicted his letters, Sirvas's credibility is questionable.

46

More importantly, Sirvas's testimony at the evidentiary hearing shows that Sirvas did not know the underlying facts of the case and who participated in the crime. Thus, Rodriguez would have been unable to show how Luis lied about Rodriguez's involvement. When Sirvas was questioned during the evidentiary hearing, he was asked directly about why he stated in his letter that he believed Luis would lie. Sirvas responded, "You know, he was lying because, you know, he was testifying, the defendant because I don't even know his name or who he was. But he told me that the State is helping me, you know, how do you call it? A charge, you know, if I testify against my codefendant. That's why he was lying, you know." At no point did Sirvas provide any testimony that sufficiently explained why Sirvas thought that Luis would lie. <u>Both his letter and his testimony assumed that because Luis decided to plead guilty to a lesser charge in order to avoid the death penalty, Luis would lie</u>. The jury was aware that Luis had entered a plea in order to avoid the death penalty.

Id. at 287–88 (emphasis added).

Claim (4) is rooted in Detective Crawford's penalty-phase testimony about information Alejandro Lago had provided him. In the penalty phase, defense counsel called mental health experts to testify that Petitioner suffered from a mental illness. The State called Crawford in rebuttal to show that Petitioner did not have a mental illness and that he used the medication he had been prescribed to get high. Over Petitioner's hearsay objection, Crawford related what Lago told him.[39]

---

[39] In addition to objecting to Crawford's testimony as hearsay, Petitioner objected on the ground that the testimony would deny him his Sixth Amendment right of confrontation. The Sixth Amendment provides that, "[i]n all criminal cases, the accused shall enjoy the right . . . to

47

The Florida Supreme Court, in reviewing Petitioner's convictions and death

sentences on direct appeal, held that

> [a]llowing the testimony of a jailhouse informant to be heard through
> the testimony of another witness not only deprived Rodriguez of the
> opportunity to cross-examine Lago, but also improperly bolstered
> Lago's statement by having a potentially more credible police officer
> repeat the statements of a potentially less credible jailhouse informant.
> This is because "when a police officer, who is generally regarded by
> the jury as disinterested and objective and therefore highly credible, is
> the corroborating witness, the danger of improperly influencing the
> jury becomes particularly grave."

Rodriguez I, 753 So. 2d at 44 (citation omitted).  The court nonetheless concluded

that "the admission of the testimony was harmless beyond a reasonable doubt

given the number of strong aggravators in this case and the conflicting testimony

as to Manuel Rodriguez's mental health, including some testimony that he was a

malingerer." Id. at 45.

In claim (4), Petitioner argued that, in derogation of the Brady rule, the State

withheld two letters Crawford and Smith had written on behalf of Lago indicating

that "Lago received consideration in exchange for his assistance and that the

results of a polygraph test that he took were considered suspect and that if the jury

---

be confronted with the witnesses against him."  U.S. Const. amend. VI. This provision is applicable to the states under the Fourteenth Amendment's Due Process Clause. See Pointer v. Texas, 380 U.S. 400, 406, 85 S. Ct. 1065, 1069, 13 L. Ed. 2d 923 (1965).

had been made aware of this information, the jury might have rejected the

statements of Lago that were presented through [Crawford's] testimony."

Rodriguez II, 39 So. 3d at 294.[40]  The letters were written on May 22, 1995, and in

February 1996 on a Metro-Dade Police Department letterhead.  The letters were

addressed to "To whom it may concern."  The May 22 letter stated:

> Alejandro Lago has assisted this agency with several investigations.  This assistance has been an immense help.  The information on all cases has always been correct and accurate.
>
> Mr. Lago has been polygraphed on all issues and has always been truthful.  It will become necessary for Mr. Lago to testify in these matters in the next couple of years.  We are confident that he will continue to help us in a truthful manner.
>
> Whatever consideration you can extend to Mr. Lago would be greatly appreciated.  Please feel free to contact the following persons for verification or detailed information.
>
> [Signed] Jarrett Crawford – Gregory Smith, Investigators, Metro-Dade Police Department, Homicide Bureau.

Doc. 16-136, at 65.  Smith testified at a Rule 3.850 hearing that he wrote the

February 1996 letter, which is not in the record on appeal,[41] at Lago's request

because Lago thought he might be deported.

---

[40] Zenobi, testifying at a Rule 3.850 hearing, said that when Crawford took the stand during the penalty phase of the trial, he and Houlihan knew that Lago was a paid informant.

[41] The transcript of the hearing reflects that the letter was made part of the record as an exhibit.

The Florida Supreme Court assumed that Petitioner satisfied the Brady

rule's first prong—that the State had "willfully or inadvertently suppressed"

exculpatory or impeaching evidence—but concluded that he had not shown

"prejudice." Id. The court recalled that on direct appeal, it

> held the trial court erred in permitting Lago's statements to be
> admitted through Detective Crawford. However, the Court explicitly
> determined that "the admission of the testimony was harmless beyond
> a reasonable doubt given the number of strong aggravators in this case
> and the conflicting testimony as to Manuel Rodriguez's mental health,
> including some testimony that he was a malingerer." Rodriguez[ I],
> 753 So. 2d at 45. Turning to the Brady claim, the challenged
> documents would only have presented potential additional bases to
> impeach Lago's statements, assuming they were admissible at all.
> This additional evidence would not change our harmless error analysis
> as set forth on direct appeal.

Id. at 294–95.

The Florida Supreme Court issued its Rodriguez II opinion on May 6, 2010,

and denied rehearing on July 9, 2010. On July 26, 2010, Petitioner petitioned the

United States District Court for the Southern District of Florida for a writ of habeas

corpus. On January 3, he amended his petition with leave of court. Then, on May

12, 2011, after reviewing the records of the prosecution of Petitioner's case in the

Circuit Court and before the Florida Supreme Court on direct appeal as well as the

Rule 3.850 proceedings in those two courts, and considering the parties'

submissions, the District Court deferred to the Florida Supreme Court's

adjudications of Petitioner's claims in conformance with the Antiterrorism and

50

Effective Death penalty Act of 1996 ("AEDPA"),[42] and denied the writ.

Rodriguez v. Buss ("Rodriguez III"), 2011 WL 1827899 (S.D. Fla. May 12, 2011).

This appeal followed.

## II.

## A.

AEDPA circumscribes federal court review of a petitioner's constitutional

claims.  Where, as here, a constitutional claim has been adjudicated in state court, a

federal court may not grant habeas relief unless the state court's adjudication "was

contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States," 28 U.S.C.

§ 2254(d)(1), or "was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

The Supreme Court has explained the meaning of the three phrases

contained in § 2254(d)(1).  The phrase "clearly established Federal law" refers

only to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions

as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S.

362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).  A state court decision

---

[42] Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. §§ 2241–55).

is "contrary to" a Supreme Court holding "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412–13, 120 S. Ct. at 1523. A state court decision "involve[s] an unreasonable application of" a Supreme Court holding "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. at 1523. A merely incorrect application of federal law, however, is not enough to warrant habeas relief. As for whether the state-court decision "was based on an unreasonable determination of the facts," we must bear in mind that AEDPA establishes a presumption that the state court's findings of fact are correct, and only "clear and convincing evidence" can rebut that presumption. 28 U.S.C. § 2254(e)(1).

Section 2254(d)'s "standard for evaluating state-court rulings" is therefore "highly deferential," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002) (internal quotation marks omitted), and "difficult to meet," Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011); it "demands that state-court decisions be given the benefit of the doubt," Woodford, 537 U.S. at 24, 123 S. Ct. at 360. To obtain habeas relief, a state prisoner must show that "there is no possibility fairminded jurists could

52

disagree that the state court's decision conflicts with [the Supreme] Court's precedents"—"that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, ___ U.S. at ___, 131 S. Ct. at 787.[43]

### B.

A Giglio violation occurs when the prosecution solicits or fails to correct false or perjured testimony and "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Giglio, 405 U.S. at 153–54, 92 S. Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 271, 79 S. Ct. 1173, 1178, 3 L. Ed. 2d 1217 (1959)) (ellipses in original). The State violates Giglio if it "includes perjured testimony and . . . the prosecution knew, or should have known, of the perjury." United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976). Thus, to succeed on a Giglio claim, a petitioner must prove (1) that the prosecution used or failed to correct testimony that he knew or should have known was false and (2) materiality—that there is any reasonable likelihood the false testimony could have affected the judgment.

---

[43] The above discussion makes it clear that § 2254(d) "creates a substantially higher threshold for obtaining relief than de novo review." Renico v. Lett, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010) (internal quotation marks omitted).

When considering a Giglio claim on federal habeas review, a petitioner must also satisfy the standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  Specifically, a petitioner must demonstrate that the constitutional error—here the Giglio violation—"had substantial and injurious effect or influence in determining the jury's verdict."  Id. at 637, 113 S. Ct. at 1722 (internal quotation marks omitted).[44]  Brecht can prevent a petitioner from obtaining habeas relief even if he can show that, were he raising a Giglio claim in the first instance on direct appeal before a state appellate court, he would be entitled to relief.  See Guzman v. Sec'y, Dep't of Corr., 663 F.3d 1336, 1355–56 (11th Cir. 2011) (finding a Giglio violation but denying habeas relief because the petitioner failed to demonstrate the error had a "substantial and injurious effect on the outcome of his trial").

Therefore, we cannot grant federal habeas relief on Petitioner's Giglio claim unless (1) Petitioner demonstrates that the Florida Supreme Court's adjudication was contrary to, or an unreasonable application of, Giglio, or was based on an

---

[44] "Because we consider the Brecht question in the first instance on federal habeas review, there is no state court Brecht actual-prejudice finding to review or to which we should defer."  Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1112 (11th Cir. 2012).  We still defer to the state court's factual findings.  Id.

54

unreasonable determination of the facts, 28 U.S.C. § 2254(d), and (2) we find that the Giglio error was not harmless under Brecht.[45]

A Brady violation occurs when the prosecution withholds evidence favorable to an accused upon request, "irrespective of the good or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196–97.  As the Supreme Court has made clear, there are three components of a Brady violation: (1) the evidence at issue must be favorable to the accused, which means it is either exculpatory or impeaching, (2) the evidence must have been willfully or inadvertently suppressed by the prosecution, and (3) the accused must have been prejudiced as a result. Strickler v. Greene, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999).  Evidence is material, i.e., prejudicial, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985) (opinion of J. Blackmun); id. at 685, 105 S. Ct. at 3385 (White, J., concurring in part and concurring in the

---

[45] "Because the Brecht harmlessness standard is more strict from a habeas petitioner's perspective than the Giglio materiality standard, federal courts confronted with colorable Giglio claims in § 2254 petitions in many cases may choose to examine the Brecht harmlessness issue first."  Id. at 1113–14.

55

judgment).[46]  We consider the materiality of the evidence withheld "collectively,

not item by item."  Kyles v. Whitley, 514 U.S. 419, 436, 115 S. Ct. 1555, 1567,

131 L. Ed. 2d 490 (1995).  We have explained that the Brady materiality standard

is more stringent than the Giglio standard because Brady requires a showing that

the result would have been different had the prosecution disclosed the withheld

evidence, whereas Giglio requires that the result could have been different had the

prosecution not used perjured testimony.  United States v. Alzate, 47 F.3d 1103,

1110–11 (11th Cir. 1995); see also Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d

1088, 1108 (11th Cir. 2012) (describing Giglio as "more defense-friendly" than

Brady because under Giglio a defendant "has the lighter burden of showing that

there is any reasonable likelihood that the false testimony could have affected the

jury's judgment" (internal quotation mark omitted)).

We do not conduct a Brecht inquiry when analyzing a Brady claim because

the latter subsumes the former.  See Kyles, 514 U.S. at 435, 115 S. Ct. at 1566

("[A] Bagley error could not be treated as harmless, since a reasonable probability

---

[46] The full opinion in Bagley did not command a full majority of the Justices.  However, Justice White, writing for himself, Chief Justice Burger, and Justice Rehnquist, endorsed Justice Blackmun's formulation of the materiality standard for Brady violations.  Subsequent Supreme Court cases have characterized the Bagley formulation as a holding, see, e.g., Kyles v. Whitley, 514 U.S. 419, 433–34, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995), and we refer throughout this opinion to Bagley with the understanding that its "holding" is based on a coalition of opinions.

56

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict . . . ." (internal quotation marks omitted) (citations omitted)).

Accordingly, a federal habeas court cannot grant relief unless (1) Petitioner demonstrates that the state high court's adjudication was contrary to or an unreasonable application of Brady or was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d), and (2) Petitioner shows that the prosecution violated Brady.

With these principals in hand, we decide whether the District Court erred in holding that the Florida Supreme Court's merits denials of Petitioner's Giglio and Brady claims were "contrary to, or involved an unreasonable application of" the holdings in those decisions, or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Petitioner has the burden of demonstrating such error.  In the District Court, he chose to ignore the burden.  As the court stated in its dispositive order,

> Petitioner, not taking into account the applicable standard of
> deference, failed almost entirely to brief his claims under the correct
> legal standard.  For the majority of his claims, Petitioner failed to
> articulate why the Florida Supreme Court's decision was an
> unreasonable determination of the facts or an unreasonable application

57

of clearly established federal law.  Indeed, Petitioner rarely cites to the opinions of the Florida Supreme Court.  Moreover, Petitioner generally fails to articulate his claims in a manner such that the Court can easily discern exactly what claims he is asserting and the legal basis for them.

Rodriguez III, 2011 WL 1827899 at *9.  Petitioner has employed the same strategy in this court.  In his opening brief, he makes no attempt to tell us how the Florida Supreme Court, in adjudicating any of his claims, rendered a decision we ought to set aside pursuant to 28 U.S.C. § 2254(d)(1) or (2).  Nonetheless, we will assume that Petitioner contends that none of the adjudications passed muster under either § 2254(d) subsection and go from there, considering claims (1) through (4) in sequence.

### III.

### A.

Claim (1) alleges violations under both Giglio and Brady.  Petitioner's Giglio claim is that Detectives Crawford and Smith lied when they denied arranging the family and conjugal visits to ensure Luis's favorable testimony,[47] and

---

[47] Detective Crawford allegedly lied in his responses to Zenobi's questions on cross-examination about the reasons for Luis's family visitations and Luis's opportunity to have sex with his wife.

> Q [Mr. Zenobi]: Was this done for any ulterior motive, was this done so that he would be a cooperative witness or help with prosecution or anything like that?
>
> A [Det. Crawford]: No, sir.

that the prosecutor, Laeser, suborned the perjury. His <u>Brady</u> claim is that the State withheld evidence of the detectives' motivations for arranging the family and conjugal visits. We address each claim in turn.

1.

Petitioner's <u>Giglio</u> claim is premised on the allegation that Detectives Crawford and Smith provided Luis with family visits and an opportunity to have sex with his wife in order to secure Luis's cooperation and favorable testimony against Petitioner.[48] He contends that the detectives were lying when they denied

---

Q: Why was this done?

A: [Luis] requested these visits for [clothes] or contact with his daughter. And there again, we spoke with the supervisor, and there was no reason not to.

Doc. 16-55, at 14.

Q [Mr. Zenobi]: And it never crossed your mind that you were doing those things for any ulterior motive or any special favors you were granting to Mr. Rodriguez?

A [Det. Crawford]: I don't understand your question.

Q: You weren't doing this to have Luis Rodriguez testify in the case, you were doing it because you wanted to be good to Mr. Rodriguez?

A: I wanted to be good to his daughter more than anything. I have no feelings for Mr. Rodriguez.

Doc. 16-55, at 53. Detective Smith allegedly lied when he reinforced what Crawford had said first, when in response to Laeser's questions on direct examination, Smith said that he learned about Luis's sex with his wife sometime after the event took place, and then when Zenobi asked him whether Luis was "allowed any conjugal visits with his wife," and he answered, "Absolutely not." Doc. 16-63, at 85.

[48] Petitioner makes this allegation based on a letter Laeser wrote after Petitioner's trial ended. As a result of Luis's admission that he was able to have sex with his wife at the police

59

this allegation at trial, and that the prosecutor, Laeser, knew they were lying.  At the Rule 3.850 hearing in the Circuit Court, Luis said he was unsure whether the detectives knew about the sex, but implied that they were aware of it because they suggested that he place a sticker over the peephole in the door of the interrogation room if he wanted privacy.  The detectives testified, consistent with their trial testimony, that they never granted Luis permission or authority to have sexual intercourse with his wife.  They further denied that they encouraged Luis to place a happy face sticker on the peephole; both testified that the first time they heard that claim was that day at the hearing.  With respect to the family visits generally, Detective Crawford testified that he allowed the visits to occur "[s]trictly because the request was initially for his young daughter, her birthday, and having raised

station, the Internal Affairs Division of the Metro-Dade Police Department investigated Detectives Crawford and Smith's handling of Luis following his and Petitioner's indictment. Laeser wrote the letter to Internal Affairs while the investigation was ongoing, and he defended the two detectives' conduct.  He stated that Luis had sexual intercourse with his wife without the permission of Detectives Crawford and Smith, and that the two detectives only learned of the event after it had occurred.  The letter contains a statement that Petitioner claims is evidence that Laeser misled the jury about the nature of Luis's family visitation privileges:

> In order to make certain that Luis Rodriguez would remain a co-operating witness, the State did not object to granting him some minor conveniences, consistent with the security needs of the case.  For example, he was permitted to meet, on rare occasion, with his mother, sisters, wife, and young daughter in the homicide office or in my office, under the supervision of two or more officers.

Doc. 16-143, at 30.

60

children we saw nothing wrong with the request with that man who was willing to cooperate being granted that request." Doc. 16-90, at 78.

The Circuit Court determined that Luis's testimony at the Rule 3.850 hearing was not credible and that the detectives had not testified falsely at trial or at the hearing when they denied permitting Luis to engage in sexual intercourse with his wife or seeking to ensure Luis's cooperation; hence, the prosecutor did not suborn perjury.

The question before the Florida Supreme Court was whether the Circuit Court's credibility findings were clearly erroneous. It deferred to the credibility findings because "competent, substantial evidence support[ed]" them. Rodriguez II, 39 So. 3d. at 289. AEDPA requires that we presume those findings to be correct. See U.S.C. § 2254(e)(1). Petitioner has not rebutted the presumption. Therefore, we defer to the Florida Supreme Court's decision that Petitioner failed to establish the factual predicate required for a Giglio violation.

As an alternative holding, the Florida Supreme Court assumed that the detectives testified falsely, with the prosecutor's knowledge, yet found no Giglio violation because the false testimony was not material, and so there was no prejudice. Petitioner disagrees. Apparently unaware of his Brecht burden to demonstrate that the false testimony "had substantial and injurious effect or influence in determining the jury's verdict," Brecht, 507 U.S. at 637, 113 S. Ct. at

61

1722 (internal quotation marks omitted), Petitioner contends that the false

testimony coupled with the prosecutor's closing argument at the conclusion of the

guilt phase of the trial misled the jury into returning verdicts of guilty and

recommending the death penalty.[49]

This misleading-the-jury argument did not impress the Florida Supreme

Court.  As the court stated, "the jury was already aware that Luis was being

provided with special treatment and that the police knowingly permitted him to

have some private time with his wife."  Rodriguez II, 39 So.3d at 289.  But that is

not why he pled guilty to second degree murder and testified against Petitioner.

The jury—everyone in the courtroom—knew that Luis did that to save his own

skin, not because he was afforded a few family visits.  We agree with the court that

the visits—and the sexual intercourse, which took place long before Luis decided

---

[49] Petitioner elaborates on this in his brief:  (1) "[T]he jury was mislead [sic] by the
prosecutor to believe, through the testimony of Detective Crawford and through ASA Laeser's
own arguments to the jury, that Luis was not given anything of value in exchange for his
testimony and cooperation at trial."  Petitioner's Corrected Br. at 38.  (2) "[T]he prosecutor went
to great lengths to bolster the testimony of Luis and mislead the jury as to the real value of
keeping this 'vital' witness happy."  Petitioner's Corrected Br. at 33.  (3) "[T]he jury was clearly
misled by the testimony of Detective Crawford and that misleading testimony was further
exacerbated by the State's closing argument."  Petitioner's Corrected Br. at 31–32.  (4) "The
State improperly bolstered its key witness and failed to correct error in Detective Crawford's
testimony, thus misleading the jury as to the credibility of Luis."  Petitioner's Corrected Br. at
29.  (5) "The integrity of the adversarial process at trial was destroyed by the State's failure to
correct Crawford's testimony concerning the 'ulterior motive' and the subsequent affirmative
argument that there was no 'motive to force Luis to continue to tell the truth.'"  Petitioner's
Corrected Br. at 34.

62

to plead guilty and testify—lacked materiality.  Moreover, assuming the truth of Petitioner's scenario—the detectives provided Luis with family visitations, including an opportunity to have sex with his wife in order to secure his favorable testimony—Petitioner has not overcome his Brecht hurdle, that the purportedly false scenario had a substantial and injurious effect or influence over the jury's verdict.

2.

Petitioner's Brady claim is that the prosecution withheld the truth about the detectives' motive in accommodating Luis's requests for family visitations and providing him with an opportunity to have sex with his wife.  The detectives' motive, Petitioner says, was to ensure that Luis would testify against him at trial, but they denied it.  Petitioner's problem is that his Brady claim is foreclosed given our deference to the Florida Supreme Court's factual finding that the detectives' trial testimony was not false.

We will assume, as the Florida Supreme Court did in reaching its alternative Giglio holding, that the detectives' did lie about their motive in providing the family visitations and Luis's opportunity to have sex with his wife, that their motive was in fact to ensure that Luis would testify against Petitioner, and that the prosecutor knew this to be their motive but did not disclose it to defense counsel or

63

even to Luis.  All Luis knew was that the detectives were accommodating his

requests for family visits.

Luis said that most of his family visitations occurred after his arrest in

August 1993 and before he pled guilty in April 1996.  What is clear is that the

visits were not, as Zenobi implied in cross-examining Crawford and Smith, the

quid pro quo for his testimony.  The quid pro quo for his testimony was the State's

promise to take the death penalty off the table and accept pleas to second degree

murder and armed robbery.  If Luis refused to testify, the deal was off; his guilty

pleas and life sentences would be set aside, and he would once again face an open-

and-shut case and certain convictions for capital murder.[50]  By the time he had

_____

[50] Luis's plea agreement with the State provided that Luis would

> freely and fully offer testimony against [Petitioner] . . . at all forms of hearings,
> pre-trial conferences, and trials, without any objection or reservation whatsoever.
> This testimony shall be unconditional; without any claim of immunity, claim of
> privilege, or 5th Amendment claim of a right to refuse to incriminate himself.
>
> . . . .
>
> However, should the defendant, Luis Rodriguez, fail to [offer such
> testimony] . . . the original charges shall be re-instituted . . . . [T]he parties would
> also return to their pre-agreement status, with one exception.  Any and all
> statements, information, evidence, or testimony which may have been offered by
> Luis Rodriguez after the entry of this agreement, but prior to the agreement
> having been voided shall be specifically admissible, without objection, in any
> subsequent hearing or trial of the defendant for the crimes charged in the instant
> information.

64

undergone defense counsel's withering cross-examination and attacks on his credibility and stepped down from the witness stand, the jury well understood this. Luis had testified in order to avoid the death penalty.

In sum, assuming that the detectives' motivation for providing Luis visits with his family and a conjugal visit with his wife was not expressly communicated to the defense, the Florida Supreme Court's decision that the information was not material, and that a Brady violation had not occurred, did not amount to an adjudication that was contrary to, or an unreasonable application of, the Supreme Court's Brady holding.

B.

Claim (2) alleges, in brief, that the State violated Brady or Giglio by withholding a promise it made to Luis "behind closed doors" to assist him in obtaining parole and allowing him to testify falsely to the contrary. Without

---

Doc. 16-143, at 22–24. In exchange for Luis's testimony, the agreement provided that State would accept pleas to three counts of second degree murder and armed burglary and concurrent sentences of life imprisonment. The State Attorney also agreed

> to directly communicate with the proper authorities, in writing, to notify them of the terms of this agreement; and that the defendant has fully co-operated, pursuant to these terms, when he has testified against [Petitioner]. The length of actual sentence served, however, shall be in the exclusive control of the Department of Corrections. There is also no promise, express or implied, that the defendant will serve any specified portion of any of these prison sentences.

Doc. 16-143, at 26.

65

referring to the Circuit Court's rationale in rejecting the claim, the Florida Supreme Court searched the record for evidence to support the claim and found none. The court acknowledged that Luis testified in the Rule 3.850 proceeding that, based on conversations he had in the State Attorney's office behind closed doors, he "thought" he would be receiving assistance in obtaining parole, but he provided no specifics beyond what was provided in the plea agreement.[51] Petitioner points to nothing in the record beyond the plea agreement that could have constituted an additional promise of assistance. Petitioner therefore fails to provide us with a reason why the Florida Supreme Court's denial of the claim should not be afforded AEDPA deference.

## C.

Claim (3) involves the Sirvas letters. After deciding that the letters should have been disclosed under Brady, the Florida Supreme Court concluded that the letters were not material. The main reason they were not was that Sirvas did not know anything about the murders and merely assumed that because Luis had taken a plea, he would lie if he testified against Petitioner at his trial. In short, his assumption lacked probative value. Petitioner does not explain why the court's

---

[51] See supra note 50.

66

materiality decision was wrong or how, under Florida law, Sirvas would be permitted to state his assumption to impeach Luis's statement that he intended to tell the truth when called to testify at Petitioner's trial. Absent the admissibility of Sirvas's statement as impeachment, a Brady violation could not have occurred. As such, Petitioner is not entitled to relief on this claim.

### D.

Claim (4) is that the prosecution, in violation of the Brady rule, withheld two letters Detectives Crawford and Smith wrote that could have impeached Crawford's hearsay testimony in which he repeated statements Alejandro Lago, a jailhouse informant, made to Crawford in September and December 1993 to the effect that Petitioner admitted to Lago that he did not need the medication prescribed for his mental illness. The first letter, written to "To whom it may concern" on May 22, 1995, stated that Lago had provided assistance to the Metro-Dade Police Department in "several investigations," that it had "always been correct and accurate," that he had always passed a polygraph test and had "been truthful," and that he would be testifying in these matters "in the next couple of years."[52] Doc. 16-136, at 65. We do not know what Detective Smith said in the

---

[52] The letter made no reference to Petitioner's case.

67

second letter, written to "To whom it may concern" in February 1996, but assume that it conveyed the same message as the May 22 letter.[53]  Petitioner argues that the letters "show[ed] that Lago received consideration in exchange for his assistance and that the results of the polygraph test . . . were considered suspect and that if the jury had been made aware of this information, the jury might have rejected the statements of Lago" presented through Crawford's testimony.  Rodriguez II, 39 So. 3d at 294 (footnote omitted).

The Florida Supreme Court noted that "to prevail on a Brady claim, [Petitioner] must show: (1) that favorable evidence—either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, [he] was prejudiced."  Id. (internal quotation marks omitted).  The court concluded that the letters were not material for two reasons.  First, there were "substantial questions as to whether Lago had been promised any benefits for his assistance before [Petitioner's] trial and whether the polygraph would have led to any favorable evidence." [54]  Id.  Putting those

---

[53] The second letter was introduced as an exhibit to Smith's testimony during the Rule 3.850 proceedings, but it is not part of the record in this appeal.

[54] The court noted that in Florida, "polygraph evidence is generally inadmissible [but] the issue . . . focus[ed] on for purposes of determining a Brady violation is whether the evidence would lead to admissible substantive or impeachment evidence."  Rodriguez II, 39 So. 3d at 294 n.13 (ellipses in original) (internal quotation marks omitted).

questions aside, the court found that "the admission of the testimony was harmless beyond a reasonable doubt given the number of strong aggravators in this case and the conflicting testimony as to [Petitioner's] mental health, including some testimony that he was a malingerer." Id. at 294–95 (quoting Rodriguez I, 753 So. 2d at 454). The District Court concluded that the Florida Supreme Court, in finding that the withholding of the letters was not material, "properly analyzed [Brady] and made a reasonable application of that law to the facts." Rodriguez III, 2011 WL 1827899 at 34. We agree. Petitioner failed to establish a Brady violation for the reason the Florida Supreme Court gave and because the letters would not have provided defense counsel with any information they did not already have at their disposal when Crawford took the witness stand in the penalty phase of Petitioner's trial.

What information did the letters contain that defense counsel did not already have after they took Lago's deposition on April 22, 1996, four and a half months prior to Petitioner's trial? Here is what they learned from Lago.

Lago was in a Florida prison serving a lengthy sentence for attempted first degree murder.[55] He was thirty-five years old, a "resident alien" who had come to

---

[55] Lago had been sentenced for that offense on a plea of guilty in 1994.

69

the United States from Cuba in 1962. By the time he was thirty, he had been arrested at least fifteen times and convicted of seven felonies, and he had done time in prison. Lago met Petitioner on September 7, 1993, in the Metro-Dade County Jail. Both were pretrial detainees; Lago had been charged with attempted first degree murder, and Petitioner had been charged with three murders. Both were confined to one-person "safety cells."[56] They met that September day on the "recreation yard" during a routine one-hour session. Unbeknownst to Petitioner, Lago was a jailhouse snitch. With the exception of identifying the incriminating information he provided the Metro-Dade Police and the FBI, Lago answered in full all the questions defense counsel asked him about his cooperation with law enforcement as an informant. He told counsel that he had seen TV news reports about the murder charges lodged against Petitioner, and that this gave him all he needed to engage in conversation with Petitioner about Petitioner's situation. Within two days, Petitioner told him he was "serving 40 years, that he [wasn't] worrying about this because . . . every institution that he go he's planning to play that he's crazy." Doc. 16-77, at 91–92. Petitioner informed Lago that he was being treated for a mental condition and had been prescribed medication. But, said

---

[56] Lago was on the eighth floor of the Jail; Petitioner was on the ninth floor.

70

Petitioner, "I ain't taking it.  I'm just making them believe I'm taking the medication."  Doc. 16-77, at 92.  Petitioner gave Lago the medication, usually for cigarettes.  This went on for two months.

Given Lago's performance on deposition, and no doubt due to his lengthy criminal record, Laeser informed defense counsel that the State would not be calling Lago to testify in the guilt phase of Petitioner's trial to rebut the expert opinion testimony defense counsel would be presenting concerning Petitioner's mental condition.  Laeser introduced the jury to the information Lago had provided by calling Crawford to the stand instead.  Crawford told the jury what Lago said on deposition.  Defense counsel could have cross-examined Crawford and, with leading questions, made the jury aware of Lago's extensive criminal record and his consistent attempts to curry favor with law enforcement by snitching on those, like Petitioner, he became close to while in custody.  The question becomes: what additional information, if any, would the letters have provided defense counsel as they faced Crawford on cross-examination?

The letters would have informed counsel that Lago was a jailhouse snitch, who had "assisted [the Metro-Dade Police] with several investigations."  Doc. 16-136, at 65.  Counsel already knew that, from questioning Lago on deposition.  The letters would have informed them that the information Lago provided was "always . . . correct and accurate."  Doc. 16-136, at 65.  Counsel knew that, too.  The letters

71

would have informed counsel that Crawford and Smith were telling "To whom it may concern" that they would "greatly appreciate[ ]" "whatever consideration" they could "extend to Mr. Lago." Doc. 16-136, at 65. This was implicit in Lago's deposition testimony. Finally, the letters would have informed counsel that Lago had taken and passed several polygraph tests. That was known to counsel as well.

In short, the letters added almost nothing to the information counsel obtained from Lago on April 22, 1996. They could have brought before the jury in cross-examining Crawford the same information they could have developed had they called Lago as a witness and examined him, as an adverse witness, with the same leading questions they could have asked Crawford. They chose not to cross-examine Crawford. Any prejudice Petitioner may have suffered was due not to the withheld letters, but to counsels' decision to forego the cross-examination. As the Florida Supreme Court reasonably found, the letters were not material.

## IV.

We have carefully considered the record in this case, the claims set out in the certificate of appealability, and the parties' submissions in their briefs and at oral argument. We conclude that the District Court properly denied the claims and therefore AFFIRM its judgment.

SO ORDERED.

72